Good morning, Your Honors, and may it please the Court, Gretel Smith on behalf of Lutfi Ghousheh. Your Honors, I'm going to be focusing on the Tier 3 analysis that the IJ and the BIA did to determine that the PLO was a terrorist organization, so therefore the PLA in 1982 in Lebanon on the Syrian border that Mr. Ghousheh was a part of was also a terrorist organization. Our stances, and quite frankly, the analysis was wrong. The analysis should have, the Court should have followed what the Uden Court did, which is rather than look from the top, is the PLO a terrorist organization, they should have started from the bottom, and they should have looked to say, okay, the PLA that Mr. Ghousheh was part of in 1982 in Lebanon, did that, did those individuals participate in terrorist activity? And no evidence has been presented that I found in the record to show that that specific PLA was involved in any terrorist activity. They were on the border of Syria. They never shot at anybody, according to our client's testimony. They were never shot at. They were bombed at some point, but it didn't show anything. Nothing has been shown that they were actually terrorist activity. And so our argument. But the organization that your client received his military training from was either the PLO or at least on behalf of the PLO, yes? Well, and I think that's, it's not shown in the record who provided that training. And I think there's substantial evidence to show that perhaps the Syrian government did the training of the PLA, because this is, there were, if you look at the evidence, or excuse me, if you look at what the expert. But your client said that it was Yasser Arafat. He stated that, but Yasser Arafat was the leader of the PLO at the time. He was the leader of the Palestinian people. If you look further, right before that answer, he was asked, who were your commanding officers? And he said, I don't know. He didn't know. But he does say that Arafat was directing the PLA, even if in a very remote way, because he was surrounded and then some things cut off from the transcript, right? It looks like he was disconnected. And so, but there's no evidence to show that he, other than that statement, that he actually was. And our client has no knowledge of whether or not Arafat was directing what his unit was supposed to be doing in 1982. He was a 22-year-old who spent three days training and a month and a half there. It seems that it's clear that the PLA in Lebanon was a subgroup of the PLO, though, at least because when he then goes back to Germany, the PLO cuts off the scholarship, right? There's definitely a connection between the PLO and the PLA. I think there's a loose connection between the PLA and the PLO. There's always been. And if you look at the expert, every PLA, because the PLA is a generic term, I think. It's not just, oh, because you're in the PLA, you're part of the PLO. The PLA, there's a Jordan part of the PLA. Now there's a Lebanese part. There's the Syrian. I believe even Egypt has a branch. So we can't, when we're talking about the PLA, we have to focus on what PLA are we talking about. And, yes, they're all loosely related to the PLO because they're all made up of Palestinian people who, at some point in time, supported Yasser Arafat in some way or another. But does that mean that because they are part of an organization that might not get direct orders from them, is that a terrorist organization? And I don't think the PLA should have been considered, at least this branch of the PLA that he was in, should have been considered a third-tier terrorist organization at that time. But I still don't quite understand. The PLO was a terrorist organization in substantial part, yes? I disagree with that because, again, the court used an analysis on, because al-Fatah was a part of the PLO, that suddenly now we have a terrorist organization. But that's what the statute says. I mean, we know that a group that has a subgroup that is a terrorist organization, that the group becomes a terrorist organization. The statute says at least the terrorism bar applies if you're in a group that has a subgroup. Your argument is, though, that he's in a different subgroup, so we have to figure out if the statute covers them. But it seems like it's hard to deny that the agency had a basis for saying that the PLO was a terrorist organization and the statute applies to that. Well, I think that, again, though, I think that the analysis they used was wrong. I think that they were looking at the PLO, so because the PLO is a terrorist organization, therefore his activities in the PLA, that may or may not have been directly directed by the PLO. Well, I think you have an argument that the PLA he was in is not a terrorist organization. But if you start telling us the PLO is not a terrorist organization, I think you're going to lose credibility, at least in my view. And we're not arguing that it's not, that it hasn't been considered a terrorist organization. What we're arguing is that the PLA is not a terrorist organization. The PLA that he was in was not a terrorist organization at that time in Lebanon. And he was sent to Lebanon, yes, under his scholarship, but there's no evidence to show who was actually controlling that. And the government, I think they didn't meet that first burden. But it was a PLO scholarship, or am I wrong about that? He received a scholarship that was money from the German government that was doled out by the PLO because of his father's relationship with the PLO at the time. Just like the expert testified that his son could go to the University of Denver for free, but his son might not have any actual connection to the University of Denver, this is the same type of analysis where our client didn't have a connection with the PLO, his father was the member. And so he received a scholarship based on that. Because of that scholarship, he did have certain terms. But his father was still a member of the PLO, I think. I mean, didn't he lose the scholarship because he withdrew from the PLA group? He deserted? He deserted the Army. And didn't that cause him to lose the scholarship? They, in 1983, withdrew the scholarship. But, again, I don't think it's clear whether or not he lost that scholarship because the PLO said, you know, hey, you weren't following the PLO's orders, or if it was because he defected the Army in that particular brigade that he was sent by the PLO to go. I know that's confusing. Seems like not much of a distinction. Well, because, again, we don't know who was actually calling the shots. Who was authorizing his unit to do what they were supposed to be doing? We don't know who his commanding officer was. We know that maybe it was loosely tied to Yasser Arafat because all of the PLAs were loosely tied to Yasser Arafat at that time. Even the Syrian PLA was. But it was definitely, we know that this PLA was outside of Beirut. It was at least 50 miles away from the actual fighting. It was towards the end of the fighting. It was in November of 1982. If we look at some of these articles that were submitted that are in the record, it talks about Mr. Arafat saying how the PLA needs to fight to the death. Well, his unit was not fighting to the death. In fact, he testified his unit never fought, never saw combat. So I think it leads to believe that there's evidence that maybe his unit wasn't being controlled by Mr. Arafat's PLO. It was being controlled by something else, some other organization or loosely part of that organization. Is there any evidence in the record that he lost the PLO scholarship for a reason unrelated to deserting from this military group? No, there is not. Again, because they are loosely connected. He's Palestinian. He was participating in the Lebanon War. I mean, at the time, that was the invasion of Israel into Lebanon. That's what he did. That act also was not a terrorist act, but because he deserted the army, I'm sure that the powers that be that doled out a scholarship said, hey, you don't deserve this anymore. You're not supporting the Palestinian cause. And I think that's part of the scholarship was to support the Palestinian cause, not necessarily support the PLO. And so when he deserted, that's the way I would take it. But even if the government, if you find that the government did have substantial evidence to show that the PLA in 1982 in Lebanon on this border was actually a terrorist organization, we believe that he did, by the preponderance of the evidence, show that the bar didn't apply to him, again, because he didn't participate in any terrorist activity. There was an ongoing conflict where Israel invaded Lebanon. And so he was part of this organization. He was part of trying to protect Lebanon from Israel invasion. And then, again, if the court does find that the bar does apply, we don't believe that the IJ or the BIA allowed him to go to the third burden-shifting tier, which is to show that he knew or should have known that this was a terrorist organization. And I believe the record shows that he didn't know that he was actually participating, if we find that this was a terrorist organization, that he was actually participating in a terrorist organization, a terrorist act. Did you make that argument to the BIA that there was a step of the analysis that was skipped? I believe that was put into our argument. Well, what do you base that argument on? I thought that was relevant to the other terrorist bar, not this one. Well, I think that we have – The knowledge requirement, I thought, was relevant to the – I can't remember what the other one is, but it's the military training one I thought quite clearly did not have as a subcomponent of the analysis any new or should-have-known element. Am I wrong about that? Well, I believe that under 1982A3B1-5 or 6, excuse me, and we can also see this in UDIN, that there is a three-tiered burden-shifting structure that you have to look at first whether or not this was a terrorist organization, and then if they knew or didn't know that they were actually participating in that. What part of this confusing statute are you looking at? So I'm actually looking at UDIN. But didn't that case deal with the other terrorism bar, not the military training one? No, it did deal with – you're correct, it did deal with the other terrorism bar. I apologize. Has there been any attempt to mediate this case? Not that I know of. Would your client be interested in that if the government were? I'm sure my client would. Okay, why don't we hear from the government, and you'll certainly get a chance to respond. Thank you. Good morning, Your Honors. Jeffrey L. Mencken, United States Department of Justice for the Attorney General. I have very little to add to our written pleadings, but I would point out that no record evidence here compels reversal of the agency's finding that Mr. Gusha did not meet his burden, which has gotten lost in this argument, of demonstrating that the PLO was not a terrorist organization when Mr. Gusha received his military training in 1982. Well, I don't think the issue is whether the PLO was a terrorist organization. The issue is whether the PLA that he was part of was. Right, and as – there are several factors that we point out that show that it was – the PLA was in Lebanon as the military wing of the PLO. Mr. Gusha's expert testified to that. But do you have any evidence that the PLA wing he was in engaged in terrorism? No, and it need not. It is part of the PLA. It is the military wing. That is what it is referred to throughout the literature. So the statute says if you're a member of a group that engages in terrorism or if you're a member of a group that has a subgroup that engages in terrorism. It sounds like this PLA group doesn't fit either of those, does it? Oh, it most certainly does. How? If it doesn't engage in terrorism, then what's its subgroup that engages in terrorism? The PLO is a terrorist organization. That's a historical fact. Right. The PLA is the military wing of the PLO. So are you basically saying it's not really a different thing, it's just all the PLO? It's a part of it, certainly. I don't know that subgroup is the accurate term. It's like saying the Defense Department is not a subgroup of the U.S. government, it's part of the U.S. government. It was in Lebanon as the muscle, as the military wing, as the boots on the ground for the PLO. And it was not. Congress seems to have envisioned that there could be terrorist groups with subgroups. I mean, that's how the statute is written. So are you saying something else is a subgroup and this doesn't count as a subgroup? I mean, you seem to be resisting the idea that it could be a different kind of group, but the statute is written that way. So how do we deal with that? The agency found it was a subgroup. I'm perhaps putting too fine a point on it. But it clearly was there at the direction. I mean, we have Mr. Gusha himself saying that he was sent to Lebanon to fight for the PLO. He says that at least four different ways. He receives military training on the PLO's behalf from the military wing of the PLO, which was the PLA. There is no evidence, and I would strongly point out that there's no evidence that some other group was controlling the PLA in Lebanon. In fact, it's Mr. Gusha's burden to prove that the PLA was completely unrelated and separate, because he's completely turned that burden around. It's not the government's burden at that point. Once the evidence indicates that Mr. Gusha received military training from the PLA, then it became his burden to prove that he was not barred under the military. But how do you fit it into the language of the statute? I mean, can you walk me through the language of the statute and tell me which phrase you think he fits into? Sure. He, Mr. Gusha received military training either from or on behalf of a terrorist organization. Now, when we get into the Tier 3 definition. The PLO. Right. He received military training from the PLA on behalf of the PLO, which sent him there, which directed him to go there. So the terrorist organization on that prong of your analysis is the PLO? It is. And by being a part, a subgroup of the PLO, that stain rolls down upon the PLA. And I thought your argument was that you don't have to show that the PLA or this particular PLA was itself engaged in terrorist activity. It's enough that some part of the PLO is engaging in terrorist activity, and he received military training on behalf of the PLO. Correct, Your Honor. There's no evidence that the PLA did terrorist activities, but it was a subgroup or part, a wing. And that's consistent, as we say in our supplemental brief, with what the Supreme Court was talking about in the HLP case, which is if you contribute to even a peaceful wing of a terrorist organization, you are contributing to that organization. And this Court said so in the Kahn case, Kahn v. Holder. Other courts have said the same thing. Can you remind me what we have in the record that speaks to the question whether the PLO, I guess, itself directed or authorized terrorist activities as opposed to whatever we're going to call these subgroups? Is it Al-Fatah or whatever? Well, we can start, thank you, Your Honor. We can start with Mr. Gusha's expert, Dr. Gabbay, who testified that the PLO was considered a terrorist organization in 1982. By whom? By the international community. Well, but neither the State Department nor Congress, in 1982 at least, had designated the PLO itself as a terrorist organization. It was not so designated. There's a point in the record, I believe it's a Congressional Research Service report, that says that in 1975 the U.S. agreed not to have diplomatic relations with the PLO until it renounced terrorism. Which it had by 1982, right? Oh, no. No, Your Honor. The PLO didn't renounce terrorism until 1988, and that was found to be insufficient by the U.S. government, and it again renounced it in 1993, as quoted. I thought as of 1982, though, that Yasser Arafat at least had basically renounced terrorism, was trying to be a more moderating influence in this dispute, and that there were other quite radical extremist groups that were maybe loosely affiliated with the PLO, but that he was trying to distance the organization from them. That's why I was asking what's in this record. I've looked into some other materials that suggest that. Right. It's twofold, Your Honor. There's the PLO's activities itself, and there is record page 1088. It talks about by the mid-1970s, under international pressure, the PLO claimed it would restrict attacks to Israel and the occupied territories, and thereafter terrorist activities are carried out. There's, let's see, by the time Mr. Gusha went to Lebanon for the PLO, the elements of the PLO, and this is record page also 1088, I believe, had long advocated, carried out, or accepted responsibility for acts of terrorism. Record page 1228, the PLO has a long history of brutal violence against innocent civilians from many nations, including the United States, and that lists activities from the 1970s into the 1980s. The idea is that by 1988 or 1993, when the PLO renounces terrorism, you don't renounce something that you haven't been doing, and certainly it's enough to get Mr. Gusha's burden. It gets over that low threshold that now he has to demonstrate by a preponderance of the evidence that he is not so disqualified, and there's no anyone alive and sentient during the 1970s and 1980s knows what the PLO was. It was a terrorist organization. So a question you may not know the answer to, but perhaps you do. Why are the immigration authorities wasting time with this guy? He's been here for decades and totally law-abiding. Well, Your Honor, we take these matters quite seriously. Military training, military-type training is taken extremely seriously to the point that Congress does not require knowledge of the nature of the organization. That was pointed out earlier. Your Honor, you're not claiming, are you, that you have no discretion in this matter? I am not aware that Mr. Gusha has sought any exemption from the Department of Homeland Security. Well, that brings me to the question that Judge Friedland raised, which is would you be interested in mediation?  He is not, by virtue of his military training, eligible for relief. There was a finding that but for that bar he would qualify for cancellation, and there is an exemption regime that the Court has recognized in the Kahn case. However, I'm not aware that he would qualify for any of that, but that's not up to the Department of Justice. That's a matter for the Department of Homeland Security. And to date, and this case is a couple years old, I'm not aware that there's been any approach to the DHS in that regard. Can you answer maybe more directly Judge Rakoff's question, which is, is there something about this individual that we don't know from this record that indicates why it's so important that he be removed from the country? I am not aware of anything that is not on the face of the record, Your Honor. Do you look at this record and kind of scratch your head in the same way that I think maybe all three of us are, which is, like, what is going on here? This person, I mean, and we have the finding, the discretionary finding, that but for this bar he otherwise is somebody who should be allowed to remain. Why in the world is the government? I mean, that's the question that was put to you. I didn't hear a direct answer. To the extent that there are exemptions available or exemptions that do exist, those are administered by DHS. I am not aware that Mr. Gusha has approached them in that regard. So if we were to refer this case to mediation, could DHS come and mediate with him? DHS could review whether he qualifies for any of the existing exemptions. I don't know that he would, but that's not my decision. And it's certainly that this has been out there for a long time, Your Honor. This is something that Mr. Gusha could have approached DHS two years ago about. So it's a little, you know, a little bit far down the road for him to claim any opportunity for that. However ---- Well, it was if he won this case, though, he'd have cancellation. So, I mean, he's been pursuing an argument that could get him a way to stay here, right? So he could do this first and then ask for the kind of relief you're describing? Well, Your Honor, I'm not quite sure the mechanics of what the Court would do, whether to deny the petition but remand for an opportunity for DHS to look at it. I don't know that I would have any objection to that. That's not my call. As I said, the Attorney General is not involved in that calculation. But I think first things first. But you don't deny that he's been here for decades, not committing any crimes. There's no crime we don't know about. He has a disabled child that he supports and a family that he supports, some of whom are citizens. I don't deny that he's been here. And I don't deny that the record doesn't reflect any criminal activity. But the immutable fact is the military training bar. That's something that he did. And that does facially disqualify him from the relief, as the agency found. If there is an exemption out there that he could have pursued any time for the last two or more years, again, I don't know that I can rule that out one way or the other. If one steals a loaf of bread, certainly one should be pursued for decades. Indeed, Your Honor. Unless the Court has any other questions, as I said, we filed a brief and a supplemental brief, and I'd be prepared to rest on that.  Thank you for your argument. Thank you, Your Honor. We'll hear from counsel for the petition and response. Thank you, Your Honors. Just to reiterate again, I don't believe that the record reflects that the PLA that he was specifically tied to was a PLA that was directly tied to the PLO and that he did engage in terrorist activity. We don't deny that he was trained for three days, and it looks like, according to the record, he had three hours of military training for three days and spent a month and a half in a PLA battalion. We don't know who controlled that PLA battalion. We don't know who gave him his direction. But I think that, looking at the record and the circumstances, I don't believe that he was engaged in terrorist activity, and I don't believe he should be barred as a result of that. Okay. All right. Thank you for your argument. The case just argued will be submitted. We'll move to the last two cases on the calendar, which we are going to call up for argument together. That's Varner v. Davey and Stroman v. Davey. If counsel for both petitioners could please come forward.
judges: Watford, Friedland, Rakoff